We'll hear Councilman Weiss against David Ben-Ramon Fine Art, LLC. David Ben-Ramon Fine Art, LLC David Ben-Ramon Fine Art, LLC David Ben-Ramon Fine Art, LLC And third, Mr. Weiss had factual support for his allegation in the complaint that the Ben-Ramon defendants concealed a Shahr-Ishqo agreement from the court in Chewiki's forfeiture case. Returning to the first argument regarding the safe harbor provision, there's no dispute that the Ben-Ramon defendants did not comply with the 21-day safe harbor provision in the rule. What's notable here is that the Ben-Ramon defendants admit that they intentionally disregarded the safe harbor rule. The district court set a briefing schedule at the pre-motion conference, and the Ben-Ramon defendants during that conference acknowledged their obligation to serve Mr. Weiss with that motion in advance of filing it. But they didn't do that. Instead, they admit in their brief that they took under consideration whether to file the motion, and then approximately 48 hours before the filing deadline, instead of asking for an extension, they sent Mr. Weiss an email copy of their sanctions brief. The brief referenced arguments in the motion to dismiss, which they did not attach, and therefore they're claiming that they are exempt from the Rule 11 safe harbor provision under this court's holding in perpetual securities. But this case is very different from perpetual securities in which the district court relied in excusing the Ben-Ramon defendants' noncompliance. Perpetual securities created an exception to the safe harbor rule, and courts have used it to excuse technical or inadvertent noncompliance, but not an intentional disregard for the rule. There's no indication that perpetual securities was intended to rewrite the safe harbor provision in Rule 11 and essentially give the move-in an opportunity. Technical failures in what sense? Well, Your Honor, the two cases that the district court cited from lower courts have excused noncompliance under perpetual securities when a move-in misses the deadline by a matter of days or hours, not an intentional disregard or an agreement to serve a party with the brief and then simply not doing it and then attempting to excuse the behavior later on. It's essentially almost an equitable exception that missing the deadline by a couple hours or a few days ultimately still accomplishes the purpose of the safe harbor provision. But that's not what happened here. Here, the district court is using perpetual securities and— that the safe harbor is waivable. In other words, if there are some equitable considerations, then it's not jurisdictional, it's not a rigid rule, it's subject to waiver. I don't think it is subject to waiver, Your Honor. How can that be if you just described it as in part equitable? Well, it's in part equitable in the sense that the district court can analyze the circumstances there to determine whether it can exercise its discretion to excuse compliance. But in the first instance, it does have to determine whether the respondent had an opportunity to gain the benefit of the purpose of the rule. And the purpose of the rule was to allow a respondent to have those 21 days not to consider whether sanctions are appropriate or whether any claim in the abstract is sanctionable, but to analyze the actual motion. And here they only had the 48 hours to analyze the actual motion. In any event, I take it part of your point is that perpetual securities doesn't quite answer this question. So there might be, in the view of some, a natural progression to the second question, but it's not answered by perpetual securities. Is that right? Yes, Your Honor, that's right. And we're saying here that based on the totality of the circumstances, it was inappropriate and abuse of discretion to use perpetual securities to excuse what amounted to an intentional disregard for the safe harbor rule. Now, turning to the second point, which is the unlawful debt claim, we're asking the court to reverse the sanctions order on that point, too, because the unlawful debt claim was not frivolous. The question of whether the unlawful debt claim was frivolous turns on this Court's holding in Durante Brothers, and the question specifically of whether Durante Brothers definitively held that a party must plead more than one usurious transaction in order to allege that a party was in the business of lending money at a usurious rate under RICO. The portion of Durante Brothers on which the district court relied was dicta. This Court held in Durante Brothers that it was leaving open the question of the precise parameters of the business of usury as intended by Congress in section 1961. Mr. Weiss made this point at the district court, and simply put, for the purposes of the Rule 11 motion, Mr. Weiss was not ignoring the law. He was just making a contrary argument based on a reasonable reading of this Court's holding in Durante Brothers and the other authorities that he cited. This Court has been clear that an argument is only frivolous if the argument is foreclosed a priori by binding precedent, but there's no chance of success and no reasonable argument to extend, modify, or reverse established law. The unlawful debt claim simply doesn't meet this standard. Beyond distinguishing Durante Brothers, Mr. Weiss provided a number of additional authorities to support his argument. The point is not whether the authorities that Mr. Weiss cited below should have won the day. That issue is behind us. But instead, the point is that Mr. Weiss had support for his argument. The district court disagreed and dismissed his claims, but simply because the district court disagreed does not mean that the claims were so reckless as to amount to a violation of Rule 11. Finally, the allegations concerning the shtar ishqa were also not frivolous and had factual support. Mr. Weiss alleged that the Benramon defendants concealed from the Court in Mr. Ciewiecki's forfeiture case the existence of a shtar ishqa agreement, which shows that Mr. Ciewiecki and Piedmont were actual partners in a business venture. The district court held that the Benramon defendants, because they filed a copy of a note which contained the phrase in accordance with heter ishqa, that therefore the allegations concerning the shtar ishqa were inaccurate. But for the district court to be right, the statement in accordance with heter ishqa on a note would need to be the same as the shtar ishqa document. As we detailed in our brief, those are two very different things. Courts in New York have recognized the difference, and Mr. Weiss relied on that when he relied on those cases, when he argued that the Benramon defendants should have but did not include the specific shtar ishqa agreement to determine the enforceability of a loan or a partnership. Whether a partnership actually existed between the two remains to be seen. But Mr. Weiss, at the end of the day, had grounds to make the allegation, especially where the two documents made reference to two separate entities and were two distinct things. Now, Mr. Molesby, what is it that you want from us? What's the decree that you want this court to enter? I'm asking this court to reverse the sanctions order. Or to vacate it. Or to vacate it, essentially. In a more technical term. Yes. And then what happens? We remand to the district court for any further proceedings, or is it over? Well, I suppose you would remand in order for Mr. Weiss to seek the return of the $20,000 he paid. But it would be a vacature and a holding that Mr. Weiss did not violate Rule 11. Well, I thought in answer to some questions earlier and to the beginning of your argument, you might have said you remand so you get the extra number of days, up to 21 days. Why isn't that? I'm sorry? Why isn't that the result of any decree of the issue? Well, we'd submit that this is not the same as – that's what happened in perpetual security, where the court remanded to determine whether the respondent would have withdrawn the pleading if given the opportunity. But here, as we said in our brief, first of all, that would be at best a hypothetical exercise where the case is completely settled. And the case is over. Mr. Malvar received satisfactory relief, and everyone has walked away. But second, notwithstanding the Rule 11 violation, there are also two other independent bases for vacating the sanctions order and holding affirmatively that sanctions were simply inappropriate here. There's Durante, right, that? Durante and the Shari-Shura, yes. So those are the primary arguments that you're making because it now sounds like you're retreating from the first argument relating to the 21-day safe harbor. No, Your Honor. I'm not retreating from the safe harbor. I'm saying that on the merits, the court did not – it was inappropriate for the district court to impose sanctions. But as an initial matter, even the Rule 11 violation on its own would warrant reversal and vacature. And unlike in perpetual security is where it may have made sense to remand in order to determine whether the respondent would have complied with the 21 days, here it's essentially – it would have been – it's an academic exercise. It would not – Why do you describe it as academic? In other words, why can't Judge Fehler here say you've got 21 days and tell me what you would have said after 21 days that you didn't say within the time period that your client responded? Well, first because there would be nothing, I guess, procedurally to withdraw. But second, the question would you have done something, that actually speaks to the whole purpose of why the safe harbor provision was drafted and changed in the first place in Rule 11 in 1993 because the respondent needs to have an opportunity in real time to determine whether to do that. And so to remand here for that type of fact finding I think would just be an extension of perpetual security in a case that simply is not factually analogous. To follow up on this, exactly what it is you hope to achieve here, I'm looking at the conclusion to your brief at page 48, and you simply ask us to reverse the district court's order which held that Mr. Weiss violated Rule 11 and directed him to pay the Behrman defendants $20,000. Two, directing the Behrman defendants to repay the $20,000 that Mr. Weiss paid in connection with the district court's order together with interest and cost. And then the old boilerplate three, granting such other and further relief as the court deems proper. So if we do this, the case is over, right? There's nothing else going on. Correct, Your Honor. And your client has paid, Mr. Weiss paid the Behrman defendants in accordance with the district court order. So they would have to return the money. I believe he paid the law firm. I'm not sure. Yes, he paid the Behrman defendants the money. Okay. All right. Thanks very much. Thank you, Your Honor. Mr. Nikas is with us virtually. Thank you, Your Honor. Can everyone hear me, first of all? Yes, we can hear you. Thank you. May it please the court. Good afternoon. My name is Luke Nikas on behalf of the athletes. The court should affirm the district court's well-reasoned decision imposing sanctions on attorney Sidney Weiss. A lawyer's pen is incredibly powerful. It can be a tool of justice when it's used appropriately, and it can be a weapon of destruction. The Southern District, in a decision affirmed by this court, Katzman v. Victoria Secret, has appropriately described a WECO claim as a thermonuclear device, which is precisely why this court and the Southern District have said that Rule 11 is particularly significant in the civil WECO context because commencement of a civil WECO action has an almost inevitable stigmatizing effect on those named as defendants. And courts have not hesitated to impose sanctions under Rule 11 when WECO claims have found to be frivolous. Now, it's important to understand the context here for what happened leading up to the sanctions motion and ultimately the substantive reasons the district court imposed sanctions. Mr. Weiss was on detailed notice for two years that his WECO case was frivolous and that he was headed for sanctions. In the summer of 2018, this is all contained in the record, Mr. Weiss contacted me. He claimed that my clients were in active plea negotiations with the U.S. attorney, and he expected those plea discussions to go poorly. That was untrue. There were no such discussions at all. He accused someone named Shea Rosen of participating in a WECO scheme with my clients, presumably because my client, Avi Rosen, had the same name as Shea Rosen, even though we have no idea who Shea Rosen even was. He accused David Ben-Ramon personally of participating in these transactions, which was untrue. There was no evidence of that whatsoever. And he ultimately received documents from me reflecting wire transfers, where they came from, transaction documents, even though he later put in a signed declaration under penalties of perjury that we provided him nothing. He accused my client of fencing a work of art by the artist Legere, even though my clients had nothing to do with that artwork, never saw it, never transacted in it. And therefore, I wrote my first of four letters in advance of the sanctions motion on July 30, 2018, in which I explained the reasons his WECO claims were meritless. I explained that my clients would pursue sanctions against him. That's at A549 in the record. I also explained that my clients were willing to settle with Mr. Weiss. At the end of that letter, you will see that I wrote, notwithstanding the defamatory accusations you have made, Piedmont remains willing to discuss a reasonable settlement with your clients in recognition of their mutual status as victims who have potentially competing claims to one work of art. And then an oral argument. That's at A188. I explained in great detail that Piedmont would be willing to buy the work back, put it into the bankruptcy estate, and it would be dealt with there, where Mr. Malvar had prevailed in having a claim of ownership awarded to him. And I said that would be the end of it. If Mr. Weiss would drop the WECO claims, Mr. Weiss would not drop the WECO claims. He persisted. He filed the complaint making those allegations, and the same claims that we had described to him as meritless. He even sued two of David Ben-Ramon's young children, a 22-year-old daughter. Yes. Mr. Nickus, is it? I'm sorry. That's correct, Your Honor. Yeah, just to kind of focus you in a little bit on the specifics of what the district court here ultimately did find to be the sanctionable or one of the bases for finding sanctionable conduct with regard to the claims of a usurious loan and sort of why the making of that claim based on a single transaction, in your view, was justified, given that the language in the Durante brothers' case does appear to be dicta. It didn't specifically hold that you have to show multiple loans. It sort of spoke favorably of that being a goal of the statute, but it doesn't say that that's the rule. So what made this filing of a claim based on that sanctionable? Yes, Your Honor. First of all, the Durante case said specifically two important things. One was that the RICO activity, that the target of RICO is not sporadic activity. It's not occasional activity. It is the business of loan sharking, and that overall is consistent with the purposes of RICO not to target one specific activity, but to target activity engaged in over time. That's number one. The court made that clear, and that's consistent with a long line of RICO authorities and the purpose of the statute. Number two, Durante said that if the case ultimately proceeds to trial and the plaintiff is unable to show more than one activity, one usurious loan activity, then that case should be dismissed. Now, is that dicta? Did it hold specifically? No, but it is absolutely clear from the language of Durante. Once you say no, so we're focused on the difference between holdings and dicta. And as I understand it, but I may be wrong, when we talk about Rule 11 sanctions, we're focused on precedent, controlling precedent that the sanction party has ignored. And you, I think, have just acknowledged that the language in Durante, which dealt with a separate issue but did have that language, is dicta. It may be powerful dicta. It may be whatever dicta, but it's not a holding. So it's not controlling authority. What else is there besides Durante? Your Honor, I respectfully disagree. That's the framing of the Rule 11 analysis. The framing should not be is there a specific controlling precedent on point. The question is what is the law, and did Mr. Weiss advance a good basis for arguing that one specific rule I guess what I'm suggesting to you is in answering the question what is the law, we look not to dicta but to holdings. And, Your Honor, we can look at two cases. Number one, Durante makes it clear that in the court's view, if the case went back and the plaintiff was unable to prove more than one usurious loan transaction, he would lose. That was the instruction of the Second Circuit on a matter that was squarely before the court. The court didn't hold. We are dismissing the case because he hasn't proven it because that wasn't the question. The question is what standard should govern the proceeding when it goes forward. I thought that the question was a statute of limitations question. The question was statute of limitations in part, but when the court addressed what proof was required below with respect to that usurious loan transaction, the court expressly said that RICO is not targeted at occasional activity. If the plaintiff is unable to prove below that there was more than one loan transaction that's usurious, then that claim should be dismissed. That's the language of the court. That standard has been relied upon by an Eastern District of New York case that expressly held, relying on its reading of Durante, that the law in this circuit is that one usurious loan transaction is not good enough. The legal commentary that has read Durante, that has commented on Durante, said it's quote-unquote clear that Durante required or that this RICO statute required more than one usurious loan transaction. And importantly, there was no basis advanced in the district court, no legitimate good faith basis to disagree. In fact, what Mr. Weiss argued is Durante and the Eastern District cases take the same approach that I do. That's what he argued in the district court. That was manifestly wrong. There was no basis for saying that. The RICO statute doesn't support the argument. There's no case in the Second Circuit that supports the argument. The Eastern District case does not support the argument. We cited cases outside the Eastern District that did not support the argument. There was no good faith basis for saying that one usurious loan transaction is good enough. And in fact, the district court said that to Mr. Weiss in the oral argument on the pre-motion letters. And Mr. Weiss said, you're right, I have not made it clear in the complaint that Paidmont engaged in a business of engaging in usurious loan transactions. I will make that clear in the complaint. And then he didn't. Instead, what he did was say in the complaint, Paidmont has engaged in a business, the substantial majority of which is usurious loan transactions. And so that is number one. May I just pivot to the 21-day safe harbor issue for just a moment? Of course. Is it your view that perpetual securities, the holding in perpetual securities, is that the safe harbor is waivable? Or is it something from which we can draw again from the language of perpetual securities a conclusion, a logical conclusion, but is that the holding of perpetual securities in your view? Yes, it is, Your Honor. In perpetual securities, the safe harbor provision was not complied with. And I'll address Mr. Malsby's arguments in a moment, but I want to answer Your Honor's question. Perpetual securities said that the safe harbor provision was not complied with, and therefore there was no record on which this Court could decide whether the attorney would have withdrawn the pleading had he been provided with the 21 days. And therefore, this Court remanded to the district court to determine whether the plaintiff would have withdrawn, amended or corrected the language, the frivolous arguments, even had it been given an opportunity. And cases subsequent to perpetual securities in the Southern District have interpreted it as much. With respect to the 21-day safe harbor, there were two things. Number one, Mr. Weiss had five opportunities in advance of the Rule 11 motion to withdraw the complaint or not pursue the complaint. Number one, I sent him a letter after he described to me on the phone in detail the basis for his client's claims. That is A-549 in the record, explained in detail why they were frivolous, explained we would be seeking sanctions. Can I just ask you, I know you're listing, I hate to jump in midway through your list, but these pre-motion contacts, should those factor into the question, factor into the issue of the notice failure? Like if there's a statute requiring notice and a lot of these things are technical and sometimes strictly construed, what weight should we give to the fact that, well, before you got to the stage of filing the motion, you know, there were letters where you talked about sanctions or other things that, I mean, is it really fair to say that those should be weighed into the actual procedural requirements? There are two categories, Your Honor, and you should give the letters I'm talking about weight in one respect and the ultimate email from Mr. Weiss in October where he weighed the Rule 11 safe harbor even greater weight. And so in the first category, the letters that I'm telling you about now, the reason these are highly relevant is because perpetual security, as this court said, go back to the district court because there's no indication in the record whether the plaintiff would pull or amend the claims asserted that are frivolous. You have a record before you, four different letters, and I'll give you the other three so you have them, plus an oral argument in front of the district court where we had explained the full grounds for the sanctions, the full grounds for the basis the claims were frivolous, and Mr. Weiss had noticed, he considered those, he had more than 21 days, in fact, he had nearly a year to consider those assertions before the Rule 11 motion was filed. So on this record, if there is absolutely no basis to say under perpetual securities that you cannot make a determination that the plaintiff would not have pulled the complaint or amended the frivolous claims, that is number one. Number two, with respect to the October email, Mr. Weiss argues that we admit we intentionally disregarded the rule. That is not accurate and that is not what our argument was in the brief before this court. What happened is at the July 2019 oral argument, the court said, there's a colloquy at A228 where the court said, the district court, to me, I want you, as you can imagine, to think long and hard before bringing a sanctions motion. And so in that specific exchange, we took the district court's word very seriously. It was clear to us that there was no pattern, there was no enterprise. Mr. Weiss had sued a 22-year-old daughter of my client just out of college for a racketeering activity in a public filing in the Southern District of New York, his 26-year-old son. Mr. Weiss talks about his unblemished record. A 22-year-old college student accused publicly in New York City, where she does business, of racketeering. She was an assistant. And so we, nonetheless, we thought very carefully through every single step. We drafted the motion to dismiss. We read the authorities. We considered what the district court said. And ultimately, we didn't make a final determination, the final decision to file the sanctions motion until October 16th, following the district court's instruction. And so what we did at that point was we emailed Mr. Weiss the Rule 11 motion and said, this is our Rule 11 motion. Please confirm whether you will withdraw the complaint or not so that we can proceed to file it on October 18th, as the court ordered. If Mr. Weiss had said no, I need more time. If he had said no, I don't understand what your arguments were. If he said no, because you haven't complied with the safe harbor, we would have immediately gone to the district court and said we took you very seriously. We considered this very carefully. We didn't decide to file our motion once and for all until we completed the motion to dismiss and went through this process. We would like an extension. And she surely would have granted it given that our delay was based on her own admonition. And Mr. Weiss did not say that. He said, I confirm we're not withdrawing the complaint. He waived that flat out. And so that second category, Judge Lee, is where you should place the most weight because he expressly waived it. But you certainly can look at this record, and it's clear, four different letters to him plus an oral argument, he didn't withdraw. I know I'm over my time. If I could make one point related to the Jiraviska issue, please. Go ahead. Thank you, Your Honor. Go ahead. Not only did Mr. Weiss fail to plead any elements of RICO, which is an important consideration here, not only did he identify one usurious loan transaction, only one, and there's zero basis for arguing the law allowed him to do otherwise, he also claimed that I, a lawyer, admitted in this bar in the Southern District, committed a fraud on the district court, and my clients committed a fraud on the district court, by not attaching the SHTART ISCA document. That is an extreme allegation to make about another lawyer and about a group of clients unless there is a good faith basis for asserting that. Mr. Weiss had no good faith basis for asserting that. In the bankruptcy proceeding, the forfeiture proceeding, we attached the promissory note. The promissory note indicates in multiple locations this agreement was done by the terms of HEDER ISCA. It is clear under New York law what that means. The HEDER ISCA is a religious doctrine that says we understand it is against Jewish law for one Jewish person to lend money to another and charge interest, but in order to get around that prescription of Jewish law, the parties, two Jewish individuals, can enter a HEDER ISCA, which basically says that one party will participate in the profits of the other, and in exchange for that, will ultimately waive the profits payment by the other, and instead of receiving profits, will charge a fixed amount. It is basically a way to get around Jewish religious law for charging interest. It is not a partnership. New York courts, we cited numerous New York courts, do not recognize it as a partnership. It is not an enforceable partnership, and we did not conceal anything related to that issue from the district court. In fact, if you look at the SHTART ISCA, it's in the record in this case. It's an A85. The SHTART ISCA says exactly what we told the court it says, and exactly what a HEDER ISCA does, which is simply allow two Jewish people to enter into what is effectively a loan transaction with an interest rate, but call it a partnership to avoid violating religious law. This is not a partnership. There was zero basis for Mr. Weiss to claim it is. There's binding New York state authority that this is not a partnership, that it's not enforceable. There was absolutely no basis for him to accuse me of violating my obligations to the court, me of committing a fraud on the court, and my clients of committing a fraud on the court, and Judge Fallia's sum up of this was in effect that Mr. Weiss evinced a carelessness with lodging very serious accusations that greatly troubled the court. This is one of many that you can see from the oral arguments, from the complaint, and to make that kind of accusation against another lawyer and against a group of clients without any basis whatsoever is more than a sufficient ground to impose this sanction. Unless the court has further questions. Well, Mr. Nikas, let me just comment. It seems to me I was a district judge when Rule 11 was adopted, and I always thought it was, frankly, not a very sound approach to dealing with obstreperous counsel. But put that aside. I mean, this seems like a very rough game that you were involved in with Mr. Weiss, and it seems to me offhand that going for this sanction, I mean, one of the great problems with Rule 11 is that it has a career-affecting impact on the lawyer who is alleged to have violated Rule 11. I mean, it's a very serious matter. You've objected to a lot of things that Mr. Weiss did to you and to your colleagues, but the Rule 11 motion is going for the jugular, really, among lawyers. A thermonuclear device. Yes, exactly so. I mean, among lawyers, a Rule 11 motion is a very dangerous thing to do, as dangerous to the target of the Rule 11 motion. So let me ask you a simple question. How much was involved in all that? If you can put monetary—this is not entirely relevant to the question before us, but how much was involved in this lawsuit to begin with? Mr. Weiss demanded several million dollars from my clients and would not settle unless they paid several million dollars. They lost hundreds of thousands of dollars in legal fees. This was a WECO claim. We talk about impact on the other side. My clients were denied bank loans. These are WECO claims. They have reputational issues in this community. We've got a 22-year-old, a 26-year-old. We have people who do business. This is a public record, the WECO allegations against them. I understand all of that, and frankly, before Rule 11, I never had any problems with counsel in cases like this, if necessary. And when Rule 11 was adopted, I would simply bring counsel into chambers and more or less suggest that we cut it out, this kind of fighting, reputational attacks on counsel as well as on the clients. I understand what you're saying about WECO. Civil WECO is a kind of Rule 11. It's an abusive statute to begin with. And I understand completely why anyone would be upset by being suddenly styled a racketeer. And there's much literature on this, which you may be aware of, how the Civil WECO provisions were inserted into the statute at the last moment in a conference committee proceeding well into the night. But what I find unsettling about this case is that both of you were obviously engaged in very heavy-handed practices. But that said, I don't quite understand what this $20,000 fine, in effect, against Mr. Wise, what benefit does this achieve? What's the benefit? Your Honor, so the benefit, Your Honor, is that it is twofold. Number one, to give you an even more precise answer to your question as to what was at stake, number one, my clients, the settlement demand to my clients that's in this record was several million dollars. Mr. Wise was seeking millions of dollars from my client, number one. Related to that, we specifically told him in two different places in the record, and you can see at A549 and A188, where we specifically said, I wrote in a letter to Mr. Wise and also told the district court, we are willing to buy this work back in the bankruptcy, and Mr. Wise's client can have it. In effect, the conversion and replacement claims, we were willing to say, here's the work back. And this would have avoided any litigation. It would have been, my four letters would not have been necessary. There would have been no briefing. We wouldn't be here today. Mr. Malbar would be in the identical position he was in, absent the spend of hundreds of thousands of dollars in the reputational destruction of my clients. That's number one. Number two, what is the benefit? The benefit, Your Honor, is that Mr. Wise accused me personally of committing a fraud on the court. Talk about the potential reputational impact in front of Judge Rakoff. Number two, the reputational impact to my clients. Lawyers need to understand, before they sign a thermonuclear device, that they can't accuse other lawyers of committing fraud on the court. They cannot accuse a group of clients like this, who do business in this city, of being racketeers, without thinking twice, without potential consequences. And when you do that, in your complaint for racketeering, not just the usurious loan provision, not just the Eder-ISCA, but not a single element of RICO was pleaded here adequately, and the district court made that clear. There's no pattern proven or pleaded. There's no enterprise pleaded. There's no horizontal, vertical relatedness. If you assert a RICO claim and... That's fine. We get the argument. We've heard it and we appreciate it from both sides. All right. Thank you, Your Honor. Thank you, Your Honor. Just briefly. It's important to note, although much of Mr. Nikos' argument related to the complaint in its entirety, the RICO claims in its entirety, the district court largely denied sanctions here. The district court imposed sanctions on two discrete claims, the unlawful debt claim and the allegation related to the Eder-ISCA. So looking at the unlawful debt claim, not only was Durante Brothers' dicta, and that is the standard on a motion for sanctions, is whether something is foreclosed a priori, whether something is objectively unreasonable under binding precedent. Mr. Weiss made the argument of the district court that it was not, that Mr. Weiss simply made a contrary argument based on Durante but also based on a host of other factors that he cited to, including the legislative history and the overall history of RICO. He argued by analogy to the Organized Crime Control Act. He cited to New York state law to, again, argue by analogy. And he cited to, although not controlling, a district court case from another district which supported his position. That, against the dicta of Durante Brothers, makes clear that the argument was not sanctionable. The district court disagreed, and that is fine. And that's not the issue here. But the question is, was he foreclosed? Was he out of the gate? Was he stopped from making that argument because it was so foreclosed by this Court's precedent that there was no chance of success, and it was an objectively unreasonable decision to try to argue against the persuasive dicta or against the dicta in Durante Brothers? This simply wasn't the case here. And similarly, with respect to the Shadar-ISCO, the allegation of the complaint did not relate to counsel. The allegation of the complaint related only to the Ben Ramon defendants. But more to the point, Mr. Weiss had support for the allegation that he was making. I'd just ask permission to go a little to finish my point. Go ahead. Thank you. Mr. Weiss had support for that allegation. He wasn't saying in the district court, and he argued this below, that there's no difference between the words in accordance with Shadar-ISCO, or in accordance with Heather-ISCO, excuse me, and a specific document. He said those two are different things, and he pointed to New York State cases that said exactly that, that said, yes, the terms in accordance with Heather-ISCO generally mean that it is a way to allow two people under Talmudic law to loan money to one another. However, courts such as the Arnab case look to the terms of a Shadar-ISCO agreement to see whether that was the intent or not. And that was the difference. So here the question is a very simple one, Your Honor, whether he had a good faith basis to make those claims. Mr. Weiss has had an unblemished 45-year career. He should not be penalized simply for making a reasoned decision. Thanks very much. Thank you, Your Honor. We'll reserve decision. We thank you both. We are adjourned. Court is adjourned. Thank you.